UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
                                                    :
UNITED STATES OF AMERICA                            :          21 Cr. 746 (MKV)
                                                    :
               -v.-                                 :
                                                    :
ADEDAYO ILORI,                                      :
                                                    :
                              Defendant.            :
                                                    :
----------------------------------------------------------------x


## THE GOVERNMENT'S MOTIONS *IN LIMINE*


                                        DAMIAN WILLIAMS
                                        United States Attorney
                                        Southern District of New York


Juliana N. Murray
Daniel G. Nessim
Assistant United States Attorneys
    *Of Counsel*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 5

   I. The Court Should Admit Co-Conspirator Statements Against the Defendant ....................... 5

     A. Applicable Law ................................................................................................... 6

     B. Discussion ........................................................................................................... 6

   II. The Court Should Permit Evidence and Testimony Regarding Ilori's Other Instances of Identity Theft and Fraud Either As Direct Evidence of the Charges or, in the Alternative, Pursuant to Rule 404(b) ......................................................................... 7

     A. Applicable Law ................................................................................................... 7

     B. Evidence of Ilori's Use of Stolen Identities to Commit Fraud During the Time Period of the Charged Offenses Is Admissible as Direct Evidence or, in the Alternative, Under Rule 404(b) ........................................................................... 9

     C. Evidence Concerning Ilori's Numerous Prior Instances of Committing Fraud and Identity Theft Is Admissible Under Rule 404(b) .......................................... 14

   III. Evidence Concerning Ilori's History of Criminal Activity Should Also Be Admitted If He Testifies ....................................................................................................... 18

   IV. Evidence or Argument Concerning the Consequences the Defendant Faces if Convicted Should be Precluded .............................................................................. 23

   CONCLUSION .............................................................................................................. 24

## **TABLE OF AUTHORITIES**

*Bourjaily v. United States*, 483 U.S. 171 (1987) ........................................................ 6

*Brown v. United States*, 356 U.S. 148 (1958) ............................................................. 19

*Cheek v. United States*, 498 U.S. 192 (1991) ............................................................. 12

*Costantino v. Herzog*, 203 F.3d 164 (2d Cir. 2000) ................................................... 13

*Huddleston v. United States*, 485 U.S. 681 (1988) ........................................ 14, 17, 18

*Parker v. Randolph*, 442 U.S. 62 (1979) ..................................................................... 9

*Rogers v. United States*, 422 U.S. 35 (1975) ............................................................. 23

*Shannon v. United States*, 512 U.S. 573 (1994) ........................................................ 23

*United States v. Agudelo*, 141 F. App'x 13 (2d Cir. 2005) ........................................ 18

*United States v. Aminy*, 15 F.3d 258 (2d Cir. 1994) .................................................. 17

*United States v. Beverly*, 5 F.3d 633 (2d Cir. 1993) ............................................. 19, 20

*United States v. Carboni*, 204 F.3d 39 (2d Cir. 2000) ................................................. 7

*United States v. Collorafi*, 876 F.2d 303 (2d Cir. 1989) ............................................ 12

*United States v. Curley*, 639 F.3d 30 (2d Cir. 2011) .................................................. 18

*United States v. DiLapi*, 651 F.2d 140 (2d Cir. 1981) ............................................... 19

*United States v. Dupree*, 870 F.3d 62 (2d Cir. 2017) ................................................ 12

*United States v. Estrada,* 430 F.3d 606 (2d Cir. 2005) ......................................... 20, 22

*United States v. Ferguson*, 758 F.2d 843 (2d Cir. 1985) ........................................... 19

*United States v. Figueroa*, 618 F.2d 934 (2d Cir. 1980) ............................................. 9

*United States v. Gambino*, 951 F.2d 498 (2d Cir. 1991) ............................................ 20

*United States v. Garcia*, 936 F.2d 498 (2d Cir. 1991) ............................................... 20

*United States v. Gelzer*, 50 F.3d 1133 (2d Cir. 1995) ................................................. 9

*United States v. Gordon*, 987 F.2d 902 (2d Cir. 1993) .............................................. 12

*United States v. Guang*, 511 F.3d 110 (2d Cir. 2007) ................................................. 7

*United States v. Havens*, 446 U.S. 620 (1980) .......................................................... 19

*United States v. Hayes,* 553 F.2d 324 (2d Cir. 1977) ........................................... 20, 21

*United States v. Inserra*, 34 F.3d 83 (2d Cir. 1994) ................................................... 17

*United States v. Kadir*, 178 F.3d 115 (2d Cir. 2013) ...................................................... 8

*United States v. Lyle*, 919 F.3d 716 (2d Cir. 2019) ...................................................... 8

*United States v. Martino*, 759 F.2d 998 (2d Cir. 1985) .............................................. 18

*United States v. Ozsusamlar*, 428 F. Supp. 2d 161 (S.D.N.Y. 2006) ........................... 18

*United States v. Pabon-Cruz*, 391 F.3d 86 (2d Cir. 2004) ........................................... 23

*United States v. Paone*, 782 F.2d 386 (2d Cir. 1986) ..................................................... 6

*United States v. Pascarella*, 84 F.3d 61 ....................................................................... 8

*United States v. Paulino*, 445 F.3d 211 (2d Cir. 2006) ............................................... 16

*United States v. Payton*, 159 F.3d 49 (2d Cir. 1998) ........................................... 20, 22

*United States v. Peterson*, 808 F.2d 969 (2d Cir. 1987) ............................................... 13

*United States v. Pitre*, 960 F.2d 1112 (2d Cir. 1992) ............................................... 9, 17

*United States v. Ramirez*, 894 F.2d 565 (2d Cir. 1990) ........................................... 16-17

*United States v. Riley*, No. 13 Cr. 339 (VEC),
 2014 WL 3435721 (S.D.N.Y. July 14, 2014) ........................................................ 23

*United States v. Roldan-Zapata*, 916 F.2d 795 (2d Cir. 1990) ............................... 8, 13

*United States v. Simmons,* 923 F.2d 934 (2d Cir. 1988) ............................................... 6

*United States v. Tussa*, 816 F.2d 58 (2d Cir. 1987) ...................................................... 9

*United States v. Vega*, 589 F.2d 1147 (2d Cir. 1978) ................................................. 19

*United States v. Viviano*, 437 F.2d 295 (2d Cir. 1971) ............................................... 17

*United States v. Williams*, 205 F.3d 23 (2d Cir. 2000) ................................................. 8

## PRELIMINARY STATEMENT

The Government respectfully seeks rulings *in limine* on certain evidentiary issues in advance of the trial currently scheduled for July 13, 2022. *First*, the Court should admit statements made by co-conspirators in furtherance of the scheme under Rule 801(d)(2)(E). *Second*, the Court should admit evidence concerning the defendant's long history of committing fraud and identity theft offenses as either direct evidence of the charged offenses or, alternatively, under Rule 404(b). *Third*, evidence of the defendant's history of criminal conduct should be admitted for impeachment purposes, under certain circumstances. *Finally*, the defendant should be precluded from making arguments that are not properly presented to the jury and are simply a guise for jury nullification.

## BACKGROUND

Indictment 21 Cr. 746 (the "Indictment") was filed on December 9, 2021, in six counts. Count One charges Adedayo Ilori ("Ilori" or the "defendant') with committing major fraud against the United States, in violation of 18 U.S.C. §§ 1031 and 2. Count Two charges the defendant with conspiring to commit wire and bank fraud, in violation of 18 U.S.C. § 1349. Count Three charges the defendant with wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. Count Four charges the defendant with bank fraud, in violation of 18 U.S.C. §§ 1344 and 2. Count Five charges the defendant with aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1), 1028A(b), 1028A(c)(4)-(5), and 2. Count Six charges the defendant with conspiring to commit concealment money laundering, in violation of 18 U.S.C. § 1956(h).[1] The Government expects that the evidence presented at trial will establish the following facts, in substance and in part:

---

[1] Co-defendant Chris Recamier ("Recamier") was charged together with Ilori in all six counts. Recamier pled guilty on June 15, 2022, and therefore will not be contesting his guilt at the July 13, 2022 trial in this case.

From at least in or about August 2020 through their arrests in October 2021, Ilori and Recamier were involved in a scheme to utilize the stolen identities of real people to fraudulently claim millions of dollars in COVID-19 relief loans guaranteed, or extended, by the Small Business Administration ("SBA"). These loans included funds from both the Paycheck Protection Program ("PPP") and Economic Injury Disaster Loan ("EIDL") program. The defendants successfully obtained more than $1 million and attempted to obtain an additional more than $9 million in this scheme. During the course of the scheme, the defendants made multiple loan applications and claimed the identities of multiple identity theft victims. The defendants represented that they ran companies that, together, employed more than 230 employees and paid approximately $3.2 million in wages on a monthly basis. The defendants also submitted falsified tax and bank documents in connection with these loan applications. Several of these applications were submitted in the name of a particular victim ("Identity Theft Victim-1"); others were submitted in the names of additional victims. The representations on these applications were all lies, and Ilori and Recamier utilized the fraudulently obtained proceeds for their own benefit, including for cryptocurrency investments, securities, cash withdrawals, and personal expenses. In many of the interactions with banks and other entities, Recamier appeared in person or submitted false identification documents bearing his photograph, while Ilori's involvement was not as obviously disclosed in documentation.

Law enforcement identified particular investment accounts utilized by Ilori and Recamier to invest fraudulently obtained funds. Between at least in or about May 2021 and in or about July 2021, a particular IP address was used to access at least one of these investment accounts on multiple occasions ("IP Address-1"). Based on subscriber records, IP Address-1 was assigned to a particular apartment in Long Island City (the "LIC Apartment"). As described below, the LIC Apartment was fraudulently rented by Recamier under the stolen identity of an identity theft

2

victim. During particular instances where IP Address-1 was used to access investment accounts storing fraud proceeds, surveillance videos identify Ilori as present at the LIC Apartment. Law enforcement also conducted surveillance of both Ilori and Recamier present in the vicinity of the LIC Apartment.

Ilori and Recamier provided numerous banks with the same phone number as a contact phone number on their loan applications and/or fraudulent bank accounts ("Phone-1"). Law enforcement obtained a GPS tracking warrant for Phone-1. In conducting surveillance concerning the location of Phone-1, law enforcement observed Ilori in the vicinity of Phone-1. In addition, law enforcement saw that Phone-1 was often located in the vicinity of Ilori's home address during the night.

On October 7, 2021, Magistrate Judge Peggy Kuo, of the Eastern District of New York, signed a search warrant, authorizing law enforcement to search: (a) the LIC Apartment, and (b) Ilori's person and the area in his immediate control. On October 7, 2021, at approximately 9:45 p.m., law enforcement officers executed the search at the LIC Apartment. Recamier was present at the LIC Apartment, and law enforcement officers placed him under arrest. Following his arrest, Recamier was provided with his *Miranda* rights, waived those rights, and engaged in an audio-recorded interview with law enforcement. During this interview, Recamier inculpated both himself and Ilori in the charged crimes. And, among other things, during the course of the search, law enforcement recovered an iMac computer (the "Computer") from the LIC Apartment.

On October 8, 2021, at approximately 10:15 a.m., Ilori left his Queens home and entered a vehicle (the "Mercedes"), which was parked outside, and as described below, had been fraudulently leased by Recamier and Ilori. Law enforcement officers approached and executed the search warrant, as it pertained to Ilori's person and the area within his immediate control. From

3

Ilori's person, law enforcement recovered, among other things, a key to the LIC Apartment, bank cards in the name of Identity Theft Victim-1, and three cellular phones, including a Motorola (the "Motorola") and an iPhone 12 (the "iPhone"). From the Mercedes's passenger compartment, law enforcement recovered, among other things, an additional cellular phone (the "Samsung"). Law enforcement also searched the trunk of the Mercedes, and recovered, among other things, an additional cellular phone; ID cards in the names of identity theft victims and bearing Recamier's photograph; and bank cards in the names of identity theft victims.

Many of the electronic devices recovered during the arrests of Ilori and Recamier provided additional evidence of the defendants' involvement in the charged offenses:

The registered user of the Computer recovered from the LIC Apartment was "DfinebyDayoIlori," a play on Ilori's name and the name of Ilori's supposed personal training business. Indeed, a business card recovered from Ilori's person at the time of his arrest identifies "Dayo Ilori" as the "Founder/Fitness Director" of "DFINE Yourself." The Computer further included records relating to businesses and individuals that Ilori and Recamier had impersonated during the course of their charged fraud and identity theft scheme.

The iPhone, which was recovered from Ilori's person, was biometrically unlocked using Ilori's face, pursuant to the warrant. The listed user of the iPhone is "Dayo Ilori." The iPhone's Notes application includes the name and tax ID of one of the companies that Ilori and Recamier used to commit the charged offenses. The iPhone also includes emails, addressed to "Dayo," concerning the tax documents for multiple corporations that Ilori and Recamier impersonated and used in the charged offenses. The iPhone also exchanged emails with an email account opened in the name of Identity Theft Victim-1, whose identity Ilori and Recamier used to create at least approximately 14 different fraudulent bank accounts, as well as in applying for COVID-19 relief

loans. The iPhone also includes: (i) a screenshot of the holdings of one of the fraudulent investment accounts, opened by Ilori and Recamier, in Identity Theft Victim-1's name; and (ii) communication records with Phone-1, which was utilized by Ilori and Recamier in the charged scheme, as described above.

The Samsung includes numerous pieces of identifying evidence establishing that Ilori used the phone. For example, a co-conspirator ("CC-1") identified the user of the Samsung as "Dayo" in a conversation about falsifying supporting records necessary to apply for COVID-19 relief loans. In addition, there are emails stored on the Samsung that involve Ilori's email account. The Samsung also includes communications with CC-1 concerning identity theft victims' identities, applying for COVID-19 relief loans, and the documentation required to do so. Among other things, the Samsung also includes artifacts concerning: (i) Ilori's and Recamier's obtaining of fraudulent COVID-19 relief loans from banks; and (ii) their laundering and use of those loan proceeds.

The Motorola also includes evidence that it was used by Ilori, including multiple audio recordings by third parties directed to "Dayo," a play on Ilori's name and a nickname he was known by, as described above. Similar to the other devices, the Motorola includes copious evidence of the charged offenses. Among other things, the Motorola includes photographs of ledgers tracking identities used in the course of the charged scheme; photographs of ID cards used; and photographs of documents submitted to banks in connection with fraudulent loan applications.

## ARGUMENT

### I.  The Court Should Admit Co-Conspirator Statements Against the Defendant

The statements made by Recamier and another co-conspirator ("CC-1") are admissible against Ilori. These statements were made by these co-conspirators in furtherance of the charged offenses, and they are thus party admissions under the Federal Rules of Evidence.

### A.   Applicable Law

The Federal Rules of Evidence define "hearsay" as an out-of-court statement "offer[ed] in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Rule 801(d)(2)(E) of the Federal Rules of Evidence provides in relevant part, "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's coconspirator during and in furtherance of the conspiracy." A Court must find two facts by a preponderance of the evidence to admit a statement pursuant to this rule: *first*, that a conspiracy that included the declarant and the defendant existed; and *second*, that the statement was made during the course and in furtherance of that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

Once a conspiracy is shown to exist, the "evidence sufficient to link another defendant to it need not be overwhelming," and "the 'in furtherance' requirement of Rule 801(d)(2)(E) is satisfied" when, for example, "a co-conspirator is apprised of the progress of the conspiracy, or when the statements are designed to induce his assistance." *United States v. Paone*, 782 F.2d 386, 390-91 (2d Cir. 1986) (internal quotation marks omitted). Statements between co-conspirators that "provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy," further the conspiracy. *United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1988).

### B.   Discussion

As described above, Ilori and Recamier conspired to commit the charged fraud, identity theft, and money laundering offenses. In addition, Ilori worked with other people including the as-yet uncharged CC-1. Among other things, Ilori and CC-1 communicated by phone, over encrypted Telegram messages, to exchange stolen identities, to advance the creation of counterfeit IDs and bank cards, and to further the fraud scheme. The conversations include specific mention of individual identities and entities used by the conspirators in furtherance of their fraud scheme. It

also includes specific discussion concerning the preparation, submission, and review of fraudulent loan applications created by Ilori and his co-conspirators.

The circumstances of this case make clear that Ilori was in a conspiracy with both Recamier and CC-1. All statements made by Recamier and CC-1 in furtherance of that fraud, identity theft, and money laundering conspiracy therefore are admissible as direct evidence against Ilori under Rule 801(d)(2)(E).

## II. The Court Should Permit Evidence and Testimony Regarding Ilori's Other Instances of Identity Theft and Fraud Either As Direct Evidence of the Charges or, in the Alternative, Pursuant to Rule 404(b)

Evidence of Ilori's (1) fraud and identity theft conduct at the time of the charged crimes; (2) benefitting from fraud and identity theft conduct committed by Recamier; and (3) long history of fraud and identity theft offenses are all admissible as trial. Some of these instances of bad conduct are admissible against Ilori as direct evidence of the charged crimes, while others are admissible under Rule 404(b) as probative of knowledge, intent, absence of mistake, preparation, and modus operandi.

### A. Applicable Law

Evidence of uncharged crimes, wrongs, or other acts is not subject to Rule 404(b) if it constitutes direct evidence of the charged offense. *United States v. Guang*, 511 F.3d 110, 121 (2d Cir. 2007). Whether such evidence is direct evidence of the charged offense depends on whether it (i) "arose out of the same transaction or series of transactions as the charged offense," (ii) "is inextricably intertwined with the evidence regarding the charged offense," or (iii) "is necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (citations omitted).

Under Rule 404(b), "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance

with the character." Fed. R. Evid. 404(b)(1). However, such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

The Second Circuit has adopted an "inclusionary rule" that "allows the admission of such evidence for any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403 of the Federal Rules of Evidence." *United States v. Lyle*, 919 F.3d 716, 736 (2d Cir. 2019) (citations omitted). In making this determination, the Court must consider whether "(1) the evidence [is] offered for a proper purpose; (2) it [is] relevant to a disputed trial issue; [and] (3) its probative value is substantially outweighed by its possible prejudice." *United States v. Kadir*, 178 F.3d 115, 123 (2d Cir. 2013) (citation omitted); *see also United States v. Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996) (evidence of other crimes, wrongs, or acts is admissible "unless it is introduced for the sole purpose of showing the defendant's bad character, or unless it is overly prejudicial under Fed. R. Evid. 403 or not relevant under Fed. R. Evid. 402" (internal citation omitted)).

Whether admitted as direct evidence or pursuant to Rule 404(b), the offered evidence remains subject to Federal Rule of Evidence 403. The Court must therefore determine whether the probative value of the offered evidence is "substantially outweighed" by a danger of "unfair prejudice" or confusion. Fed. R. Evid. 403. The Second Circuit has found admission appropriate where the offered evidence "'did not involve conduct any more sensational or disturbing than the crimes with which [the defendants were] charged.'" *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (quoting *Roldan-Zapata*, 916 F.2d at 804). Generally speaking, "any proof highly probative of guilt is prejudicial to the interests of that defendant. The prejudice that Rule 403 is concerned with involves 'some adverse effect . . . beyond tending to prove the fact or issue that

justified its admission into evidence.'" *United States v. Gelzer*, 50 F.3d 1133, 1139 (2d Cir. 1995) (quoting *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980)). To the extent there is any risk of unfair prejudice from otherwise probative evidence, the Court may provide limiting instructions to remind the jury that the defendants are not on trial for any offense other than the crimes charged. *See United States v. Tussa*, 816 F.2d 58, 68 (2d Cir. 1987) (limiting instruction sufficient to preclude prejudice to defendant); *see generally Parker v. Randolph*, 442 U.S. 62, 75 n.7 (1979) ("The 'rule' – indeed, the premise upon which the system of jury trials functions under the American judicial system – is that juries can be trusted to follow the trial court's instructions.").

**B.    Evidence of Ilori's Use of Stolen Identities to Commit Fraud During the Time Period of the Charged Offenses Is Admissible as Direct Evidence or, in the Alternative, Under Rule 404(b)**

**1.    Relevant Facts**

The Government respectfully seeks an *in limine* ruling that it may introduce evidence concerning Ilori's (a) use of the stolen identities of identity theft victims during the time period of the conduct charged in the Indictment and (b) benefiting from Recamier's use of stolen identities of identity theft victims, as aided and abetted by Ilori, during the same time period.

*First*, in or about spring 2021, Recamier rented an apartment at 44-41 Purves Street in Long Island City, New York (the "LIC Apartment"). This apartment was rented under the name of an identity theft victim ("Identity Theft Victim-2"). Identity Theft Victim-2 is one of the identity theft victims who Ilori discussed with CC-1. Documentation that Recamier provided in connection with the lease of the LIC Apartment included a New York State driver's license in the name of Identity Theft Victim-2, but bearing Recamier's photograph. Recamier signed Identity Theft Victim-2's name to the leasing application and rental documents. Recamier claimed that Identity Theft Victim-2 was employed by an entity, Amana Air Charters LLC, that Ilori and Recamier had used to apply for a charged loan. The management company at the LIC Apartment noticed that Ilori was

frequently present at the LIC Apartment and told Recamier that Ilori should be formally added as a registered guest in order to be allowed such frequent access. In response, Recamier identified Ilori as a co-habitant at the LIC Apartment, with Ilori claiming the name of another identity theft victim ("Identity Theft Victim-3"). The defendants also attempted to apply for a COVID-19 relief loan in the name of Identity Theft Victim-3, which is part of the Indictments' charges.

Although the Government does not believe Ilori resided at the LIC Apartment, Ilori was frequently present and was captured on surveillance video visiting the LIC Apartment on multiple occasions, including at times where investment accounts in the name of Identity Theft Victim-1, which received fraud proceeds, was accessed using IP Address-1, which was assigned to the LIC Apartment. Ilori also possessed a key to the LIC Apartment at the time of his arrest.

*Second*, from in or about spring 2021 through in or about fall 2021, on multiple occasions, Ilori used a bank card in the name of Identity Theft Victim-1 to purchase items at a Manhattan coffeeshop. The account tied to this bank card was associated with both Identity Theft Victim-1 and a corporation that the defendants used to successfully obtain more than $500,000 in PPP funds. This account was funded with fraud proceeds.

*Third*, in or about summer 2021, Ilori rented an apartment at 123 Melrose Street in Brooklyn (the "Melrose Street Apartment"). This apartment was rented under the name of Identity Theft Victim-3. Documentation that Ilori provided in connection with the lease of the Melrose Street Apartment included a New York State driver's license in the name of Identity Theft Victim-3 but bearing Ilori's photograph. In submitting this application, Ilori submitted bank statements purportedly in the name of Identity Theft Victim-3. However, these statements were substantially identical to bank statements that Ilori and Recamier had submitted in connection with

loan applications charged in the Indictment, with only dates of transactions and the account name changing. In both statements, the listed transactions and the associated amounts are identical.

*Fourth*, in or about September 2021, Recamier leased the Mercedes (a 2021 Mercedes Benz S580) under the name of another identity theft victim ("Identity Theft Victim-4"). Documentation that Recamier provided in connection with the lease of the Mercedes included bank cards and a social security card in Identity Theft Victim-4's name, as well as a New York State driver's license in the name of Identity Theft Victim-4 but bearing Recamier's photograph. Ilori was observed driving and otherwise utilizing the Mercedes on multiple occasions. Ilori was also arrested while preparing to operate the Mercedes. In addition to its use in connection with acquiring the Mercedes, Ilori and Recamier applied for at least two fraudulent loans using Identity Theft Victim-4's name and other identifiers.

### 2. Discussion

Evidence that Ilori was engaged in these four instances of identity theft and fraud is admissible as direct evidence because these instances of fraud and identity theft either arose out of the same transaction or series of transactions as the charged offense and/or are necessary to complete the story of the charged crimes at trial.

First, these four instances all involve use by Ilori and Recamier of identities, entities, accounts, or documents that they also utilized in the charged crimes. They thus constitute direct evidence of the near contemporaneous use by Ilori and his co-conspirator of these identifiers in the charged offenses. As to the coffeeshop purchases, the lease of the Mercedes, Ilori's addition to the LIC Apartment as a co-habitant, and the lease of the Melrose Street Apartment, Ilori and Recamier utilized individual stolen identities that they also used in filing the charged loan applications. As to Ilori's lease of the Melrose Street Apartment, he utilized a bank statement that he had also submitted in connection with charged loan applications. And as to the lease of the LIC

Apartment, Ilori and Recamier claimed an association to a corporation they had used to apply for one of the charged pandemic-relief loans. The use of the same identities and supporting documents by Ilori and Recamier for these four fraud and identity theft schemes is direct proof of their use of the same identities, accounts, and documentation in the charged fraud and identity theft scheme. Second, the four above-described schemes involve the use of funds that are either directly traceable to fraudulently obtained funds, or the use of cash payments, at the same time that Ilori and Recamier withdrew large amounts of cash proceeds of the charged scheme. They are inextricably linked to the charged offenses and necessary to complete the story of the crime at trial.

In addition, and in the alternative, evidence of Ilori's and Recamier's involvement in these four fraud and identity theft schemes is admissible under Rule 404(b) to show knowledge, intent, and absence of mistake as to the charged offenses. An essential element in all the charges in the Indictment is knowledge. Accordingly, "trial courts should follow a liberal policy in admitting evidence directed towards establishing the defendant's state of mind." *United States v. Collorafi*, 876 F.2d 303, 305 (2d Cir. 1989). Here, evidence that Ilori and his co-conspirator were nearly contemporaneously involved in additional identity theft and fraud schemes, from which they profited, helps establish that Ilori's preparation and submission of fraudulent COVID-19 relief loan applications using stolen identities of innocent third parties was "a voluntary, intentional violation of a known legal duty," rather than an innocent error. *Cheek v. United States*, 498 U.S. 192, 201 (1991) (citation omitted); *see also United States v. Dupree*, 870 F.3d 62, 76 (2d Cir. 2017) ("[A]court can . . . admit evidence of prior acts as probative of knowledge and intent if the evidence is relevant to the charged offense, *i.e.*, if there is a similarity or connection between the charged and uncharged acts.") (citation omitted); *United States v. Gordon*, 987 F.2d 902, 908 (2d Cir. 1993) ("[T]he probative value of the proffered evidence depends largely on whether or not

there is a 'close parallel' between the crime charged and the acts shown." (internal quotation marks omitted)); *United States v. Peterson*, 808 F.2d 969, 974 (2d Cir. 1987) (prior act evidence admissible if sufficiently similar "to permit the jury reasonably to draw from that act the knowledge inference advocated by the proponent of the evidence"). The above-described instances are highly similar to the charged conduct, both with respect to Ilori's actions and the time period in which they were undertaken, and are thus very probative.

These instances of identity theft and fraud are also probative of Ilori's modus operandi, including his nearly identical conduct in directing Recamier to reveal his face as part of the fraud scheme, in sending Recamier into banks (which operate video surveillance systems) to conduct transactions, and in submitting Recamier's photograph to apply for loans and open accounts. In the above-described instances involving the lease of the LIC Apartment and the lease of the Mercedes, Ilori allowed Recamier to engage directly in the fraud scheme in a way that could trace back to Recamier, while Ilori protected himself from more overt involvement but nevertheless benefited from the crimes. This is another potent similarity between these instances of identity theft and fraud and the charged crimes.

Furthermore, the probative value of the evidence is not substantially outweighed by any prejudice. The allegation that the defendant engaged in additional fraud and identity theft is no more inflammatory than the crimes for which he has been charged. Indeed, the amount of property that the defendant obtained and attempted to obtain through these four schemes is far less than the charged crimes. This evidence does not involve conduct "more sensational or disturbing" than the charged offenses and any unfair prejudice is therefore minimal. *See United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (evidence that is neither "more sensational" nor "more disturbing" than the charged crimes will not be deemed unfairly prejudicial); *see also Costantino*

13

*v. Herzog*, 203 F.3d 164, 174 (2d Cir. 2000) (noting that "virtually all evidence is prejudicial to one party or another," and so "to justify exclusion under Rule 403 the prejudice must be unfair"). Nor will the evidence be confusing, particularly because, as explained above, much of the evidence is inextricably linked to the charged offenses. Moreover, any risk of undue prejudice could be addressed through an appropriately crafted limiting instruction. *See Huddleston v. United States*, 485 U.S. 681, 691-92 (1988).

### C. Evidence Concerning Ilori's Numerous Prior Instances of Committing Fraud and Identity Theft Is Admissible Under Rule 404(b)

#### 1. Relevant Facts

In addition to the above-described examples of Ilori's repeated commission of fraud and identity theft crimes, the defendant has also been arrested and convicted of multiple prior such crimes. Evidence related to those offenses, including the convictions themselves, should be admitted at trial pursuant to Rule 404(b).

Both Ilori and Recamier took part in a fraud and identity theft scheme between in or about March 2019 and in or about March 2020, which resulted in Ilori's 2021 conviction in the Southern District of New York in case 20 Cr. 378 (LJL). This offense involved the submission of fraudulent business loan applications utilizing the stolen identities of identity theft victims and false claims of association with corporate entities, as well as the submission of falsified bank and tax documents. In furtherance of the scheme, Ilori obtained stolen identity information of victims and falsified documents. Recamier's role included impersonating identity theft victims and visiting banks to conduct transactions under the assumed identities. Among other things, Ilori submitted loans including supporting documents that were essentially identical to supporting documents submitted in support of loan applications charged in this prosecution. In addition, both Ilori and his co-conspirators were captured in audio-recorded conversations discussing Ilori's ability to

obtain stolen identities and falsify associations with businesses in order to apply for loans on fraudulent grounds. On or about April 8, 2021, Ilori pleaded guilty to the above-described conduct in the Southern District of New York.

On or about June 28, 2019, Ilori was arrested when attempting to open bank accounts under stolen identities. Law enforcement recovered multiple ID cards with identity theft victims' names and identifiers, but bearing Ilori's photograph. Law enforcement also recovered bank cards in the names of identity theft victims.

On or about June 8, 2006, Ilori was arrested when attempting to open bank accounts using, among other false documents, counterfeit identification cards in identity theft victims' names, and a forged utility bill. On or about April 17, 2007, Ilori was convicted by a jury for possession of a forged instrument in the second degree, in New York County Supreme Court.

On or about January 12, 2006, Ilori was arrested when attempting to purchase goods using a fraudulently obtained credit card in the name of an identity theft victim. At the time of his arrest, Ilori was in possession of the identity theft victim's personal information and a counterfeit identification card in that victim's name. On or about June 1, 2006, Ilori pleaded guilty to for possession of a forged instrument in the second degree in New York County Supreme Court.

On or about May 31, 2004, Ilori was arrested when attempting to purchase goods using a stolen credit card. At the time of his arrest, Ilori was also in possession of a fraudulent identification card. On or about September 20, 2004, Ilori pleaded guilty to possession of a forged instrument in the third degree in New York County Criminal Court.

On or about September 7, 1999, Ilori attempted to purchase electronics using the stolen identity of an identity theft victim. In connection with this conduct, Ilori utilized a counterfeit

identification card. On or about January 28, 2000, Ilori pleaded guilty to the conduct in Nassau County 1st District Court.

From in or about March 1997 through in or about November 1997, Ilori engaged in a bank fraud scheme, which involved his opening bank accounts under multiple aliases and depositing fraudulent checks into those accounts. During that scheme, Ilori attempted to deposit approximately $100,000 in fraudulent checks, and he successfully obtained $30,000 from financial institutions. On or about February 17, 1998, Ilori pleaded guilty to theft of government funds in the Southern District of New York.

### 2. Discussion

Ilori's conduct leading to each of the above-described arrests and convictions, involved identity theft. His conduct also frequently involved fraud. The Government should be permitted to introduce evidence of Ilori's prior bank fraud and identity theft conduct and convictions, because those convictions are probative of Ilori's knowledge, intent, and absence of mistake with respect to the charged crimes.

Evidence of Ilori's prior identity theft and fraud conduct and convictions should be admitted under Rule 404(b) to show that Ilori had the requisite knowledge or intent to commit the charged crimes, or to rebut any assertion that he was not the person who committed the crime, because there is a similarity (indeed, almost an identicality) between the prior and the charged conduct. *See United States v. Paulino*, 445 F.3d 211, 221-22 (2d Cir. 2006). Here, knowledge and intent are considered disputed issues, because the defendant has not expressed a decision not to dispute that element of the offense. *See United States v. Ramirez*, 894 F.2d 565, 568 (2d Cir. 1990) (if the defendant "disavows awareness that a crime was being perpetrated" then "knowledge is properly put in issue"); *United States v. Aminy*, 15 F.3d 258, 260 (2d Cir. 1994) (explaining that sufficient similarity, not "synonymity," is required to establish the relevance of prior similar

16

convictions or bad acts). Accordingly, "evidence of prior or similar acts may be introduced during the government's case-in-chief, 'rather than waiting until the conclusion of the defendant's case.'" *Pitre*, 960 F.2d at 1120 (quoting *United States v. Caputo*, 808 F.2d 963, 968 (2d Cir. 1987)); *see also United States v. Inserra*, 34 F.3d 83, 90 (2d Cir. 1994) ("[A]dmission of similar act evidence to prove intent or knowledge . . . is admissible during the Government's case-in-chief if it is apparent that the defendant will dispute that issue.").

Evidence concerning Ilori's similar prior convictions is plainly admissible to show knowledge or intent to commit the charged crimes. The elements of the charged crimes are nearly identical to the elements of Ilori's prior convictions. *See Aminy*, 15 F.3d at 260. Moreover, the method and means of the conduct underlying Ilori's prior convictions—forging documents, submitting fraudulent applications, falsely claiming association with corporate entities, obtaining stolen identify information from victims, and possessing and using false ID cards and credit cards in victims' names—provides a reasonable basis for inferring that Ilori had knowledge or intent to commit the charged crimes. *See, e.g.*, *Huddleston*, 485 U.S. at 687-88. Moreover, admissible conduct is not limited to prior bad acts involving the exact crimes charged, but rather extends to any prior misconduct that is probative of the defendant's readiness to commit the charged crimes. *See United States v. Viviano*, 437 F.2d 295, 299 n.3 (2d Cir. 1971) ("[E]vidence of prior criminal conduct [need not] be formally the same as the crime charged.") (internal quotation marks omitted).

The fact that some of these prior convictions took place several years before the charged conduct does not alter the conclusion that the evidence is admissible. The Second Circuit has held that "where relevant and adequately probative prior-act evidence will help a jury shed light on the issues before it, such evidence may be admitted, notwithstanding a relatively longer passage of

time since the commission of the prior act." *United States v. Ozsusamlar*, 428 F. Supp. 2d 161,

171 (S.D.N.Y. 2006) (admitting evidence of prior acts from twelve years before charged period);

*see United States v. Curley*, 639 F.3d 30, 59 (2d Cir. 2011) (admitting evidence of incidents that

"pre-dated the charged conduct by as much as fifteen years" where they "demonstrate a pattern of

activity that continued up to the time of the charged conduct"); *United States v. Martino*, 759 F.2d

998, 1005 (2d Cir. 1985) (finding no abuse of discretion in admitting an eleven-year-old conviction

where "the prior conviction of federal narcotics offenses was evidence which could be interpreted

by the fact-finders as shedding light on these key issues . . . [and] the evidence was both relevant

and probative"); *United States v. Agudelo*, 141 F. App'x 13, 15 (2d Cir. 2005) (summary order)

(affirming district court's admission of evidence of drug activity from six or seven years prior to

the charged conduct).

And, as described above, such evidence is no more prejudicial than the charged conduct in

this case, which involves far broader identity theft and defrauding the Government of funds

intended to help protect the jobs of many during a cataclysmic global pandemic. Moreover, any

risk of undue prejudice could be addressed through an appropriately crafted limiting instruction.

*See Huddleston*, 485 U.S. at 691-92.

### III.  Evidence Concerning Ilori's History of Criminal Activity Should Also Be Admitted If He Testifies

For the reasons described above, evidence of Ilori's prior convictions and uncharged

criminal activity should be admitted in the Government's case-in-chef as direct evidence of the

charged crimes or under Rule 404(b). However, even if the Court were to preclude that evidence

in the Government's case-in-chief, Ilori's prior bad acts and similar criminal convictions should

admitted as impeachment evidence under Rules 608 and 609, to the extent that Ilori testifies in his

defense.

### 1.  Applicable Law

A testifying defendant "has no right to set forth to the jury all the facts which tend in his favor without laying himself open to a cross-examination upon those facts." *Brown v. United States*, 356 U.S. 148, 155 (1958) (quotation omitted); *see also United States v. Havens*, 446 U.S. 620, 627 (1980) (essential to permit Government to pose "proper and effective cross-examination"); *United States v. DiLapi*, 651 F.2d 140, 151 (2d Cir. 1981) (Mishler, J., concurring) ("basic fairness" requires that "story presented on direct [by defendant] is measured for its accuracy and completeness by uninfluenced testimony on cross-examination"); *United States v. Vega*, 589 F.2d 1147, 1151 n.3 (2d Cir. 1978) (defendant should not be allowed to "frustrate the truth-seeking function of trial by presenting tailored defenses insulated from effective challenge"). Thus, cross-examination of a defendant appropriately encompasses "*all* non-collateral matters." *See United States v. Ferguson*, 758 F.2d 843, 849 (2d Cir. 1985) (emphasis added).

Rule 608(b) permits cross-examination of specific instances of conduct of a principal witness if "probative of the character for truthfulness or untruthfulness" of the witness. Fed. R. Evid. 608(b). In deciding the extent of proper impeachment material under Rule 608(b), courts generally apply the balancing considerations of Federal Rule of Evidence 403. *See Hynes v. Coughlin*, 79 F.3d 285, 294 (2d Cir. 1996); Fed. R. Evid 608 (b)(2) advisory committee note (1972); *Huddleston*, 485 U.S. at 685.

The scope of cross examination allowed the Government in cross examining a defendant is significantly broader when the Government seeks not just to attack the defendant's credibility in a general fashion, but to engage in impeachment by contradiction or "impeachment of specific falsehoods." *United States v. Beverly*, 5 F.3d 633, 639 (2d Cir. 1993). In such a situation, the restrictions of Rule 608(b) no longer apply. *See id.* "Where a defendant testifies on direct about a specific fact, the prosecution is entitled to prove . . . that he lied as to that fact." *Id.* (citing *United*

*States v. Garcia*, 936 F.2d 648, 653 (2d Cir. 1991)); *see also United States v. Payton*, 159 F.3d 49, 58 (2d Cir. 1998); *United States v. Gambino*, 951 F.2d 498, 503-04 (2d Cir. 1991); *United States v. Garcia*, 936 F.2d 648, 653-54 (2d Cir. 1991). "The same holds true for defendant's false statements on cross-examination." *Beverly*, 5 F.3d at 639-40.

The Government also would be entitled to use Ilori's prior convictions to impeach him during cross-examination, pursuant to Federal Rule of Evidence 609. *See United States v. Estrada*, 430 F.3d 606, 617 (2d Cir. 2005) ("Rule 609(a)(1) presumes that all felonies are at least somewhat probative of a witness's propensity to testify truthfully."); *United States v. Hayes,* 553 F.2d 324, 828 (2d Cir. 1977) (prior conviction for importation of cocaine probative on the issue of accused's veracity and was properly admitted under Rule 609(a)(1)).

With respect to a conviction within the last ten years (or a conviction resulting in confinement within the past ten years), it (1) may be admitted to "attack a witness's character for truthfulness" if the crime was punishable by more than one year of imprisonment, and the admission is not barred by Federal Rule of Evidence 403; and (2) must be admitted for this purpose "for any crime regardless of the punishment . . . if the court can readily determine that establishing the elements of the crime required proving—or the witness's admitting—a dishonest act or false statement." Fed. R. Evid. 609(a). The party "desiring to take advantage of automatic admission of a conviction under the second prong must demonstrate to the court that a particular prior conviction rested on facts warranting the dishonesty or false statement description." *Hayes*, 553 F.2d at 827 (internal quotation marks omitted).

With respect to an older conviction, it is admissible only if: "(1) its probative value, supported by specific facts and circumstances, substantially outweighs its prejudicial effect; and

(2) the proponent gives an adverse party written notice of the intent to use it so that the party has a fair opportunity to contest its use." Fed. R. Evid. 609(b).

Impeachment evidence involving a defendant's prior criminal convictions must also satisfy Rule 403, which provides that a court may exclude evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. In balancing probative value against prejudicial effect under this rule, courts examine the following factors: (1) the impeachment value of the prior crime, (2) the remoteness of the prior conviction, (3) the similarity between the past crime and the conduct at issue, and (4) the importance of the credibility of the witness. *See* 4 *Weinstein's Federal Evidence* § 609.04[2][a], at 609–20 (1997); *Hayes*, 553 F.2d at 828.

### 2. Discussion

As described above, in addition to the charged conduct, which includes the use of false IDs in the names of identity theft victims and the submission of falsified documentation to fraudulently obtain pandemic relief loans and the laundering of the proceeds of that scheme, the defendant has also engaged in other criminal and bad acts. The defendant and Recamier engaged in various fraud and identity theft crimes, including some leveraging the same false IDs that they used in connection with the charged crimes. In the event that the defendant takes the stand in his own defense and asserts that he is generally law-abiding and could not have committed the charged crimes, his history of prior criminal activity and bad acts would be highly relevant impeachment material. *See* Fed. R. Evid. 608(b).

As a threshold matter, the Government anticipates Ilori may argue that he did know knowingly enter into a conspiracy or knowingly possess or conspire to possess false IDs. If Ilori were to testify, for example, that he did not possess the requisite knowledge or intent to participate

in the charged conduct, he should not be permitted to conceal from the jury facts that impugn his credibility, such as a character for engaging in fraud. *See Estrada*, 430 F.3d at 617 (noting in context of Fed. R. Evid. 609 that crimes of "fraud" are more probative of dishonesty than those of violence).

Should Ilori decide to testify, his credibility is likely to be the key issue at trial. In that case, his prior convictions are clearly admissible for purposes of impeachment. As described above, Ilori's 2021 conviction in case 20 Cr. 378 (LJL) involved substantially identical conduct to the charged crimes—including, specifically, the submission of fraudulent loan applications, utilizing the stolen identities of identity theft victims. Ilori pled guilty to conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349, and also admitted to money laundering conspiracy, in violation of 18 U.S.C. § 1956. That conviction constitutes a crime of dishonesty that is automatically admissible for impeachment purposes under Rule 609(a)(2). Fed. R. Evid. 609(a)(2); *Estrada*, 430 F.3d at 614-15.

Ilori's additional similar prior convictions, which are more than 10 years old, are similarly admissible for purposes of cross-examination. As outlined above, all those convictions involved "dishonesty or false statements" and are therefore *per se* probative of credibility and admissible for impeachment purposes under Rule 609(b). While the convictions are more remote in time, they involved substantially similar conduct to the charged crimes. Moreover, based on the specific facts and circumstances of those convictions, they are probative both of Ilori's knowledge and intent to commit the charged offenses and his credibility. Fed. R. Evid. 609(b); *United States v. Payton*, 159 F.3d 49, 57-58 (2d Cir. 1998). And because the fraud offenses Ilori committed in the instant case are on a larger scale than Ilori's prior fraud convictions, the prejudicial effect of those crimes is substantially outweighed by their probative value. *See Payton*, 159 F.3d at 58-59.

## IV. Evidence or Argument Concerning the Consequences the Defendant Faces if Convicted Should be Precluded

Argument and evidence concerning the possible consequences of conviction should be precluded. It is well established that the jury's function is to find the facts and to determine whether, based on those facts, the defendant is guilty of the crimes charged. Where the jury has no role at sentencing—such as in this case—it "should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" *Shannon v. United States*, 512 U.S. 573, 579 (1994) (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)). Information regarding the potential consequences of a guilty verdict is irrelevant to the jury's task. *See id.* Providing jurors with such information invites them to consider matters that are outside of their province, distracts them from their fact-finding responsibilities, and creates a strong possibility of confusion. *See id.*; *see also United States v. Riley*, No. 13 Cr. 339 (VEC), 2014 WL 3435721, at *2 (S.D.N.Y. July 14, 2014). The Second Circuit has directly held that a jury should not be instructed on or aware of possible mandatory minimum sentences. *See United States v. Pabon-Cruz*, 391 F.3d 86, 91-92 (2d Cir. 2004).

These rules exist for good reason. As discussed above, arguments concerning incarceration are irrelevant to the jury's task and threaten to confuse the jury and risk nullification. But there are additional reasons these arguments should be precluded. Allowing the defendant to submit these arguments to the jury creates a gap where the Government must, in effect, remain silent because the contrary arguments are plainly improper to submit to a jury. Considering the clear impropriety of the Government making such arguments to the jury, the defendant is no more able to make the converse arguments to the jury. Rather, all of these arguments concerning the consequences of a conviction should be made to a judge in connection with sentencing. The defendant should

23

accordingly be precluded from offering evidence or argument that has no purpose other than to seek to persuade the jury to consider punishment, or any other potential consequence of conviction.

## **CONCLUSION**

For the foregoing reasons, the Government's motions *in limine* should be granted.

Dated:  New York, New York
June 15, 2022

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:  /s/_____
Juliana N. Murray
Daniel G. Nessim
Assistant United States Attorneys
(212) 637-2314 / -2486

24